In re WESTERN PACIFIC AIRLINES, INC., a Delaware corporation, Debtor.

WESTERN PACIFIC AIRLINES, INC., and Smith Management, Inc., Appellants,

v.

GATX CAPITAL; Aircorp, Inc.; Sunrock Aircraft; CCA, KG Leasing & Mercury; Sabre Group, Inc.; and Orix; Appellees,

and

Babcock & Brown Aircraft Management, And Boullioun Aircraft Holding Co., Inc., Appellees and Cross–Appellants.

No. CIV. A. 98–K–358.
Bankruptcy No. 97–24701 SBB.

United States District Court, D. Colorado.

May 1, 1998.

## ORDER ON MOTIONS FOR REHEAR-ING AND RECONSIDERATION OF MARCH 10, 1998 MEMORANDUM DECISION ON APPEAL

KANE, Senior District Judge.

Before me are various motions for rehearing and for reconsideration filed by Appellees GATX Capital, Inc. (GATX), Boullioun Aircraft Holding Co., Inc. (Boullioun) and Sunrock Aircraft Corporation Ltd. (Sunrock), challenging my March 10, 1998 Memorandum Decision on Appeal. *Western Pacific Airlines, Inc. v. GATX Capital (In re Western Pacific Airlines)*, 219 B.R. 305 (D.Colo.1998). Appellee Babcock & Brown Aircraft Management, Inc. ("Babcock & Brown"), has moved for immediate certification of the decision to the Tenth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b), but alternatively joins in the motions for rehearing and reconsideration.

I grant the motions in order to consider the supplemental briefs submitted by the parties and various *amici* in support thereof. I have now done so and have also considered carefully the cases and other authorities cited therein. I conclude oral argument would not materially assist me in considering the issues raised and deny the request for rehearing. I reaffirm my decision on appeal, as clarified below. I also certify the case to the Tenth Circuit Court of Appeals for consideration of the issues decided.

## I. *BACKGROUND.*

### A. *Procedural History.*

When Western Pacific Airlines applied for Chapter 11 bankruptcy protection in late 1997, I agreed to hear all appeals from the bankruptcy court's orders on an expedited basis. The airline was in the midst of efforts to reorganize and to continue operations out of Denver International Airport. The ensuing appeals involved the competing interests of the airline and its various creditors during the course of these efforts—specifically those creditors from which WestPac leased its aircraft and those creditors from which West-Pac obtained the millions of dollars necessary to attempt a reorganization while under bankruptcy protection.

The bankruptcy court, and then this court on appeal, attempted to balance these competing interests within the language and purpose of the Code. Initially, this meant authorizing WestPac to obtain extensive postpetition financing from entities affiliated with Smith Management Co. (referred to collectively as "Smith" or the "DIP Lenders") over the lessors' objection. The lessors had objected both to the grant of superpriority to Smith under 11 U.S.C. § 364(c)(1) and to the collateralization provisions granting Smith a priority interest in WestPac's § 365(f) right to assume and assign its aircraft leases, arguing these unlawfully infringed on their rights under § 1110 of the Code to retake possession and control of their aircraft upon default. *See* Order Authorizing Debtor to Obtain Postpetition Financing Pursuant to Sections 364(c)(1) and 364(d), No. 97–24701 SBB (Bank.D.Colo. Dec. 3, 1997)(as clarified by Findings of Fact and Conclusions of Law to Supplement Order Authorizing Debtor to Obtain Postpetition Financing (Bank.D.Colo. Dec. 9, 1997)).

In its Findings and Conclusions issued December 9, 1997, the bankruptcy court rejected lessors' assertion that § 1110 allowed

them to enforce lease terms prohibiting the assumption and assignment of leases notwithstanding a debtor's powers under § 365(f) to do so. (Findings/Conclusions, p. 3.) The bankruptcy court refused to interpret § 1110 as "trumping" or "overriding" § 365, disagreeing the statute gives lessors of aircraft "a veto power" over a debtor's § 365 rights. *Id.* Congress, the court noted, had "made no attempt to craft the language of § 1110 to override § 365, although the statute specifically mentions §§ 362, 363 and 1129," and stated "the legislative history and all of the cases addressing both § 1110 and § 365 of the Bankruptcy Code discuss the compatibility of the two provisions, not their mutual exclusivity." *Id.*

Several lessors appealed, but failed to seek a stay of the order. In the meantime, the DIP Lenders began immediately to disburse what ultimately became $20 million in loans to WestPac. A large portion of the proceeds were transferred directly to the lessors for lease payments. In accordance with § 1110, the airline retained possession of its aircraft by curing existing defaults and agreeing under § 1110(a) to make future lease payments as they became due. Several of the lessors withdrew their appeals. Only Boullioun pushed forward.

In a Memorandum Decision issued January 13, 1998, I endorsed the bankruptcy court's analysis regarding the interplay of §§ 1110 and 365 and affirmed the Order Authorizing Debtor to Obtain Postpetition Financing. *See Boullioun Aircraft Holding Co., Inc. v. Western Pacific Airlines, Inc. (In re Western Pacific Airlines)*, 216 B.R. 437, 440 (D.Colo.1998)("*WestPac I*"). The purpose of the postpetition loan was to enable WestPac to make its lease payments, retain possession of its aircraft and continue in operation. The bankruptcy court acknowledged the loan was risky, but viewed it as the only alternative to the "immediate collapse of the Debtor as a going concern," an option contrary to the primary function of bankruptcy and "unpalatable ... for the Debtor, its creditors, and the traveling pub-

lic." (Findings/Conclusions, p. 4.) I concluded the protections afforded lessors under § 1110 "must be read in harmony with § 364 and with Chapter 11's overall purpose of rehabilitating the debtor and allowing it to continue in business." *Ibid.*

Notwithstanding the influx of cash, WestPac continued to struggle. In late January 1998, the DIP Lenders invoked their right under the financing agreement to disburse funds on an item-by-item basis only. On February 4, 1998, WestPac's board voted to cease operations. The aircraft lessors moved immediately pursuant to § 1110 to retake possession of their aircraft. By the first week of February 1998, WestPac had missed certain of its lease payments that had become due. WestPac objected to the motions for immediate repossession, arguing that it was entitled to a continuing 30-day period under § 1110(a)(1)(B)(ii) in which to cure such defaults, during which time it intended to market its leases in accordance with § 365(f).

In rulings issued orally on February 9 and 12, 1998, the bankruptcy court rejected WestPac's argument and ruled the aircraft were subject to immediate return under the prepetition terms of the leases. The court agreed with the lessors that § 1110 did not "afford a debtor an open-ended right to cure all postpetition defaults within 30 days after each default." *See In re Western Pacific Airlines*, 219 B.R. 298, 303–04 (Bank.D.Colo. 1998)(formalizing February 9 and 12 rulings).[1] Rather, the court ruled that entering into a § 1110 agreement had the effect of removing the lease from the bankruptcy proceedings entirely such that the parties' rights and obligations upon default are governed exclusively by its prepetition terms. *Id.* Because the leases here provided for the immediate return of the aircraft and the automatic termination of the lease upon default, the bankruptcy court felt constrained by the terms of § 1110 to do anything other than order the immediate return of the aircraft and a termination of the leases. *Id.*

---

1. The bankruptcy court concurred with lessors that a debtor's right to cure defaults under § 1110(a)(1)(B) is limited to those defaults that

occur within the 60-day cure period and expires on the sixtieth day, or 30 days after the default, whichever is later (the "60/90 day cure period").

The bankruptcy court expressed concern about the effect its decision, the "very first" legal guidance on the issue in the country, would have on WestPac and the DIP Lenders. The court acknowledged its ruling "immediately, summarily and irrevocably strips the Debtor of any opportunity to cure such defaults and thereby salvage any value of the DIP Lender's collateral," a result that was "unfair and financially catastrophic" for both under the circumstances. *In re WestPac,* 219 B.R. at 304–05. Accordingly, the bankruptcy court invoked its equity powers under § 105 and § 365(d)(10) of the Code to accord WestPac an additional 72 hours to cure. WestPac's failure completely to cure its monetary defaults within 72 hours would constitute a termination of the leases and entitle the lessors "immediately and unilaterally [to] take complete control and possession of their aircraft." *Id.* WestPac failed to cure within the 72 hours and, on February 12, the bankruptcy court ordered the immediate return of the aircraft and the termination of the leases.

In the decision that forms the basis of these motions for reconsideration/rehearing, I reversed. *Western Pacific v. GATX Capital,* 219 B.R. 305 (D.Colo.1998)("WestPac II").

### B. *WestPac II*

In WestPac II, I determined that neither Congress nor the courts had addressed the proper construction of 11 U.S.C. § 1110 under the circumstances presented and treated the question as one of first impression. I agreed with the bankruptcy court that the proper interpretation of § 1110 as it applies to defaults of future performance obligations under the circumstances presented involved a "delicate balance of rights," *WestPac II,* 219 B.R. at 299–300, (citing *In re Western Pacific,* 216 B.R. at 438–39), but disagreed that the only rights to be considered were those of the airline and its aircraft lessors.

I found the construction of § 1110 in the bankruptcy court's February rulings irreconcilable with the construction forming the basis of WestPac I, and determined a broader balance was necessary. To interpret the rights of the "debtor, its creditors and the traveling public" under §§ 364–65 and Chapter 11 generally as being greater than those of aircraft lessors under § 1110 when reorganization seems possible (*see* Dec. 10 Findings/Conclusions, at p. 4) but then reach the opposite conclusion when reorganization fails, is not only "catastrophic" for the particular debtor and DIP lenders involved in a given case, but also to the prospects for the successful reorganization of airlines faced with bankruptcy in the future. The bankruptcy court's second interpretation collapses together § 1110 and § 365 by equating an agreement under § 1110(a)(1)(A) to meet future performance obligations under a lease as they become due with a formal "assumption" of the lease under § 365. It ignores legislative statements, other authority and its own previous determination that these concepts are distinct and that a debtor retains its right to cure postpetition defaults in lease payments even after entering into a § 1110 agreement. In essence, the bankruptcy court's second construction of § 1110 granted lessors the "veto power" the court previously determined they did not have.

Looking to the plain language of the statute, I determined that § 1110 expires by its own terms once a debtor elects to cure and assure and emerges from the 60/90 day period with possession of the aircraft. Thereafter, the parties' rights and obligations are governed by the generally applicable provisions of the Code, including § 365. This interpretation obviated the need to reach the question of whether § 1110(a)(1)(B)(ii)(I) entitles debtor to a continuing 30-day grace period to cure post-sixtieth day defaults. Upon expiration of the 60/90 day period, the debtor's rights upon default are limited to those available under § 365 and would be subject to the bankruptcy court's continuing authority to balance the interests of the debtor and all creditors, and to effect equity over the course of the bankruptcy proceedings.[2]

---

2. In reaching this conclusion, I considered the uncertainty and costs associated with the open-ended interpretation of § 1110(a)(1)(B)(ii) advocated by WestPac and the DIP Lenders on appeal. A continuing or "rolling" 30-day right to cure all defaults under a § 1110 agreement would invite a potentially endless and costly series of legal and logistical maneuverings associated with repeated defaults of lease payments that might, or might not, be cured within the next 30

If Congress intended a different result, it could have included § 365 in the list of provisions that do not affect the operation of § 1110.

Thus, I concluded in the instant case that lessors were not entitled under § 1110 to invoke the automatic termination provisions of their leases or unilaterally retake possession of their aircraft upon WestPac's failure to make payment under its § 1110(a)(1)(A) agreement. Instead, they would have to pursue their continuing rights to terminate their leases and/or retake possession under generally applicable provisions such as §§ 363(e) or 365.

Contrary to the lessors' assertions on reconsideration, an interpretation that establishes § 365 as the fulcrum around which subsequent failures are addressed neither allows the debtor to avoid cure nor prevents the lessor from retaking its aircraft. It does not render the assurance of future performance under § 1110(a)(1)(A) "illusory" or "meaningless" nor, as Boullioun argues, does it encourage debtors to enter into such agreements immediately upon filing for bankruptcy in order to thwart lessors' § 1110 rights.[3] Rather, it forces debtors upon failure to meet their future performance obligations a single opportunity (rather than an endless series of them under the continuing 30-day cure period theory) to either reject the lease and return the aircraft or seek authorization from the court to "assume" it formally. Because neither assumption nor repossession under § 365 is self-executing, this construction affords the bankruptcy court an opportunity to consider the merits of a request to assume and to accept or reject the conditions of any proposed assumption with an eye to the interests of the estate and of other creditors, including those entitled to priority under § 364. In any event, lessors would remain, as they always were, entitled to the benefit of their bargain under the leases. Lessors would either receive payment on the entire amount of the lease (either in the bargained for installments or as administrative expenses) or to a return of their aircraft and rejection of the lease.

This construction, I determined, allowed for the most seamless reading of §§ 362, 364, 365, and 1110 of the Code and best effected the balancing of interests of reorganizing airlines, the lessors of their aircraft, and those who assume the risk of financing reorganization efforts. It affirmed the "fresh start" principle underlying all of bankruptcy and, although the lessors disagree, preserved the benefit of their bargain under the leases either to receive payment or retake possession of their aircraft.

It also affords predictability and finality in the application of § 1110. While the lessors see this as a cup half empty because it limits their ability to invoke § 1110(a)(1) unilaterally to retake possession of their aircraft after the 60/90 day period, it is also a cup half full because it limits the debtor's ability to invoke § 1110(a)(1)(B)(ii)(I) to default on payments but repeatedly avoid repossession during the life of the bankruptcy. The aircraft financing industry can anticipate and adjust to the possibility that § 365 will govern post-sixtieth day defaults in aircraft leases previously cured and affirmed under § 1110. The return to regular and orthodox administration under § 365 best effects the nature and purpose of special interest legislation under the Code.

Ultimately, the Tenth Circuit will offer its view of the relative correctness of these conflicting interpretations of the applicability and scope of § 1110. For purposes of the

---

days. Lessors would have to anticipate both scenarios with each default, preparing to retake possession and market their aircraft, only to have the effort wasted if the debtor cured on the thirtieth day. A default on the next payment would begin the cycle again. Other creditors of the airline, airline employees, vendors, and the traveling public would also bear the cost of this uncertainty. An interpretation that avoids this result best effects the parties' and the public's need for certainty in the Code's administration.

3. A debtor who enters into a performance agreement in order to retain possession under § 1110 must not only cure all existing prepetition defaults but also all postpetition defaults occurring from the date of the order in bankruptcy through 60 days thereafter. The cost of these cures, together with the considerable rights lessors retain after the sixtieth day to retake possession or secure payment under § 365, render the scenario envisioned by Boullioun unlikely.

instant motions, however, I offer the following thoughts and conclusions regarding the arguments raised and reaffirm my decision as clarified below.

## II. *DISCUSSION.*

### A. *Standard for Granting Rehearing or Reconsideration.*

Given the novelty of the issues on appeal, my approach to them in WestPac II and the expedited appeal process, a literal approach to the standards for granting or denying motions for rehearing or reconsideration under Bankruptcy Rule 8015 or as implied under Rule 59 of the Federal Rules of Civil Procedure is neither helpful nor apposite. The issue rests soundly in the vale of judicial discretion.

I note at the outset that the issues underlying WestPac I and II are now largely academic because WestPac has abandoned its efforts to reorganize and is no longer operational. Attention has shifted from the individual entities and these particular bankruptcy proceedings to the aircraft financing industry generally. In their motions for rehearing and reconsideration, the lessors touch lightly on the specifics of the case, choosing to speak instead on behalf of the "market" or the "industry" and the effect WestPac II will have on their ability to conduct business in the future. They attach newspaper articles and affidavits of numerous nonparty carriers, manufacturers, investment bankers and other financial institution representatives, decrying the effect of my "unprecedented" and "amazing" decision on the cost of financing and their future willingness to extend it. (*See Mot.* of GATX Capital for Reh'g, Attachs. A–F). The lessors have been joined by the likes of Salomon Smith Barney, Airbus Industrie, Northwest Airlines, Inc. and C.I.T. Leasing Corporation who, as "friends of the court," argue on behalf of a "broad spectrum of financing parties" that the March 10 decision narrowly

construing the self-help provisions of § 1110 thwarts market "expectations" and threatens the entire aircraft financing industry. *See* Mem. Law of Aircraft Financer Amici, at 12.

■ These "sky-is-falling" arguments, which I have indulged out of respect for the parties and not because they have any proper role in a request for rehearing or for reconsideration under the rules, are better suited for the committee rooms and hallways of Congress where they may prevail precisely because of their preponderance and pitch. My duty is to construe the law as it is written, seeking guidance from salient legal principles and authority free from the constraints imposed by lobbyists and industry types hoping to inform my decision. Where Congress fails to anticipate an eventuality and enacts a statute silent as to its treatment, court must construe according to objective standards of interpretation. If dissatisfied with the result, Congress may revisit it.

In their Motions, GATX, Boullioun and Sunrock disagree with my determination that the issue was one of first impression, and contend my construction of § 1110 is contrary to "many published bankruptcy court decisions interpreting the application of section 1110 well after the initial 60-90 day period" (Br. Supp. Sunrock Mot. at 3) and violates the language and intent of the statute. (GATX Mot. at 8–10.) Because I interpreted the statute in a manner not advocated directly by either side to the appeal, I will, as an exercise of discretion, grant the Appellees' motions for rehearing/reconsideration so that I may review the supplemental briefs and authority submitted in support thereof. I have now read these briefs, including the brief of financing industry *amici curiae,* and reviewed the authorities. I have also performed additional research on my own and have revisited the authorities I considered before issuing my March 10 decision.[4]

---

**4.** Because part of the Appellees' critique appears to be based on an assumption that I reviewed little, if any, authority before issuing my March 10 decision, I specifically list the authorities considered on reconsideration to avoid a similar critique in any impending appeal(s):

1. H.R.Rep. No. 95–595, 95th Cong. (Sept. 8, 1977) (accompanying H.R. 8200), 1978 U.S.C.C.A.N. 5963, 6198;

2. S. Rep. No. 95–989, 95th Cong. (July 14, 1978) (accompanying H.R.S. 2266), 1978 U.S.C.C.A.N. 5963, 1978 WL 8531 (Leg.Hist.);

Having done so, I reaffirm my decision and certify the issue to the Tenth Circuit Court of Appeals for review.

### B. § 1110.

■ Congress enacted § 1110 as part of the Bankruptcy Reform Act of 1978. While its purpose was to extend the special protections afforded aircraft equipment vendors and lessors under Chapter X of the existing Code to all reorganizations under the new Chapter 11, it also intended to balance these protections with the debtor's right to a "breathing spell" and a meaningful opportunity to reorganize.[5] Thus, the new § 1110 was intended to continue protections allowing aircraft financiers to retake possession of their collateral under a lease or security agreement unencumbered by the automatic stay or any other power of the bankruptcy court, but also to afford debtors a 60-day window of time in which to avoid a retaking by agreeing to perform their future obligations under the lease or agreement as they come due (§ 1110(a)(1)(A)) and by curing its defaults. H.R. Rep. at 239, 1978 U.S.C.C.A.N. at 6198. If the debtor meets these conditions before the expiration of the 60-day window, it is entitled under the express terms of the statute to retain possession of the aircraft. *Id.*

Before the Bankruptcy Reform Act of 1978, the predecessor to § 1110 (§ 77j of the Bankruptcy Act, 11 U.S.C. § 205(j) (1970)) granted financiers of aircraft equipment absolute protection from the effects of the automatic stay. The protection applied only to Chapter X reorganization cases, and allowed aircraft lessors and others to move against their collateral without regard to the pendency of a reorganization involving their debtors.

As part of the consolidation of Chapters X and XI into the new Chapter 11 in 1978, Congress extended this protection to all reorganizations governed by the new Chapter 11, but modified it in order better to balance the lessors' interest in their collateral with the debtor's interests under the new Chapter 11. The specifics, paraphrased below, are taken directly from the Senate and House Judiciary Committee Reports on the Act.

At the time Congress was considering new § 1110, the existing Code provided for three

3. 11 U.S.C. §§ 361–65, 1110, 1129, 1168 (1997);

4. Chapters IX and X of the pre–1978 Bankruptcy Code, including 11 U.S.C. § 205 (1970).

5. *Collier on Bankruptcy* ¶¶ 365, 1110.04, 1168.01 (15th ed.1997) and 5 *Collier on Bankruptcy* ¶ 77.12 (14th ed.1978);

6. *Norton Bankruptcy Law & Practice* § 81.2 (2d ed.1993);

7. *Bankruptcy: Effect of Stipulations under 11 U.S.C.A. § 1110*, 92 A.L.R. Fed. 170 (1989);

8. K. Hoff–Patrinos, *Aviation Finance Revisited: The 1994 Amendments to Section 1110 of the Bankruptcy Code*, 69 Am. Bankr.L.J. 167 (1995);

9. W. Winter, *Preserving the Benefit of the Bargain: The Equitable Result*, 13 Bankr.Dev. J. 543 (Spring 1997);

10. M. Jacob & M. Meises, *The 1994 Amendments to Section 1110 of the Bankruptcy Code: The Issues Left Up in the Air*, 5 J. Bankr.Law & Proc. 349 (1996);

11. S. Schick, *When Airlines Crash: Section 1110 Revisited*, 48 Bus. Law. 277 (Nov.1992);

12. J. Giddens & S. Schick, *Section 1110 of the Bankruptcy Code: Time for Refueling?* 64 Am. Bankr.L.J. 109 (Spring 1990);

13. G. Gerstell & K. Hoff–Patrinos, *Aviation Financing Problems Under Section 1110 of the Bankruptcy Code*, 61 Am. Bankr.L.J. 1 (Winter 1987);

14. *In re Continental Airlines, Inc.*, 932 F.2d 282 (3d Cir.1991);

15. *Seidle v. GATX Leasing Corp.*, 778 F.2d 659 (11th Cir.1985);

16. *GATX Leasing Corp. v. Airlift Int'l, Inc. (In re Airlift)*, 761 F.2d 1503 (11th Cir.1985);

17. *In re Air Vermont, Inc.*, 761 F.2d 130 (2d Cir.1985);

18. *In re Central Florida Metal Fabrication, Inc.*, 190 B.R. 119 (Bkrtcy.N.D.Fla.1995);

19. *In re Pan Am Corp.*, 125 B.R. 372 (S.D.N.Y.1991);

20. *In re Air Nat'l Aircraft Sales & Serv., Inc.*, 53 B.R. 310 (Bankr.E.D.N.Y.1985);

21. Excerpts from 138 Cong. Rec. S8241–01 regarding proposed 1994 amendments to § 1110, including various articles by Perry Flint from the December 1991 vol. of Air Transport World and testimony of Philip Baggaley, Senior Vice President, Corporate Finance, Standard & Poor's Ratings Group, 138 Cong. Rec. S8241–01, *S8261.

I read some of these articles as well as various newspaper reports discussing my March 10 decision with a gimlet eye because they lack academic distance and are self-serving evocations of representatives of the aircraft financing industry itself.

5. H.R.Rep. No. 95–595 (1977)(accompanying H.R. 8200), *reprinted in* 1978 U.S.C.C.A.N. 5787, at pp. 5963–6435, 1977 WL 9628 (Leg.Hist.), and S.Rep. No. 95–989 (1978)(accompanying H.R.S. 2266), *reprinted in* 1978 U.S.C.C.A.N. 5787, at pp. 5787–5962, 1978 WL 8531 (Leg.Hist.).

exceptions to the automatic stay relating to transportation equipment. The first, enacted in 1935, protected owners of rolling stock railroad equipment leased or conditionally sold to a debtor in a railroad reorganization case. H.R. Rep. 95–595, at 238–39, 1978 U.S.C.C.A.N. at 6198 (citing 11 U.S.C. 205(j) (1970)). The second was added in 1957 and protected owners of aircraft or aircraft equipment that had been leased or conditionally sold to an air carrier undergoing Chapter X reorganization. *Id.* The third, added in 1968, protected owners of ships leased or conditionally sold to a certificated water carrier that was in a Chapter X reorganization. *Id.* These protections were added as a means of encouraging new financing in the relevant industries by making them " 'bankruptcy proof.' " *See id.*

"Whether or not there was an initial need for these provisions," Congress stated, "their existence has become largely addicting to the financing industry." H.R. Rep. 95–595 at 239, 1978 U.S.C.C.A.N. at 6198. Notwithstanding "industry claims [that] it would simply cease financing of the relevant equipment if the protections were removed," Congress expressly intended that § 1110 "provide[ ] an alternative to these sections of current law, which are harsh in their application," in order to "accommodate[ ] the joint interests of the equipment financier and of the integrity of the bankruptcy laws and the reorganization process." *Id.*

Section 1110 was intended to "remove[ ] the absolute veto power over a reorganization that lessors and conditional vendors have under existing law." H.R. Rep. at 405, 1978 U.S.C.C.A.N. at 6361. The financier would remain entitled either to payments under the terms of the financing agreement or to his equipment, but "the choice of which the financier will get [is left] to the trustee." *Id.* at 239, 1978 U.S.C.C.A.N. at 6199. "Thus, equipment that the trustee needs to keep operating the business is beyond reach by the financier if the trustee is willing to continue to pay for it." *Id.*

## C. *Analysis.*

In addition to its intent that a debtor under the new Chapter 11 be entitled to retain possession of its aircraft under § 1110

over lessors' objections if it were willing to continue paying, Congress also expressed an intent that this right continue beyond the initial 60 day period. Specifically, Congress stated that a debtor's right to retain possession was conditioned upon (1) its agreement "to perform [its] obligations under a security agreement, conditional sale contract or lease of equipment, within 60 days after the date of the order for relief"; (2) the cure of "all prior defaults" and (3) the cure of "any defaults that occur *after* the agreement to perform is made ... within 30 days after they occur." H.R. Rep. 95–595 at p. 239, 1978 U.S.C.C.A.N. at p. 6198 (emphasis added).

WestPac seized on this statement and the fact that the specific language of § 1110(a)(1)(B)(ii) contained no limitation on the duration or application of a debtor's 30-day right to cure to urge the reversal of the February 9 and 12 rulings. As set forth above, I agreed that a debtor's right to cure continues beyond the making of a § 1110(a)(1)(A) performance agreement and beyond the 60-day period, but rejected the view *that this right was limitless.*

■ I now reiterate my conclusion that the competing rights of lessors and their debtors under aircraft leases cease to be governed by § 1110 once a debtor emerges from the 60/90-day period having complied with its provisions for retaining possession, and clarify it as follows.

### 1. *Existing Authority.*

In their various motions, GATX, Boullioun and Sunrock deny the question presented is one of first impression. Instead, they allude to a "great weight" of authority they claim interprets § 1110 beyond the 60-day window that I either overlooked or misapprehended. Appellees' impassioned arguments notwithstanding, none of the cases cited specifically analyzes § 1110 in this regard nor concludes that a lessor's right immediately and unilaterally to retake possession is triggered irrevocably upon debtor's failure to meet its performance obligations under a § 1110(a)(1)(A) agreement. Certainly none does so under circumstances where, as here, the debtor wishes to retain possession and

cure in order to invoke whatever rights it may retain under § 365(f), which had been pledged, pursuant to a previous order of the court, as collateral for millions of dollars in postpetition loans. To the contrary, these authorities support the conclusion, already accepted, that the rights of both lessors *and* debtors, either to retake possession or to avoid it, survive the making of a § 1110(a)(1)(A) agreement and the expiration of the 60-day period.

In the related cases of *GATX Leasing Corp. v. Airlift Int'l, Inc. (In re Airlift Int'l, Inc.)*, 761 F.2d 1503 (11th Cir.1985) and *Seidle v. GATX Leasing Corp.*, 778 F.2d 659 (11th Cir.1985), for example, the trustee voluntarily returned the aircraft to the lessor after the debtor failed to make several payments under its § 1110(a)(1)(A) agreement. At issue was not the lessor's right to the return of its aircraft (which was unchallenged by the trustee) or the debtor's right to cure (the debtor no longer wished to retain possession) but rather the lessor's right under § 365 to treat missed payments as administrative expenses (*In re Airlift*) and the trustee's right under § 547 to recover those payments that had been made (*Seidle*). While there is dicta in both cases supporting Appellees' assertion that a lessor's right to retake possession under § 1110 extends to defaults under a § 1110(a)(1)(A) agreement, the same dicta supports the assertion, rejected by Appellees on appeal, that the debtor's right to cure extends to these defaults as well.[6]

Similarly, the only treatise specifically interpreting a lessor's right automatically to retake possession upon default under a § 1110(a)(1)(A) agreement does so only by analogy to § 1168(a) governing railroad rolling-stock equipment and only by assuming, again contrary to Appellees' contentions on appeal, that the 30-day cure provisions of § 1168(a)(2)(B)(ii)(I) also continue beyond the making of such an agreement. *See* 8 Collier on Bankruptcy, ¶ 1168.01[3]-[4], at 1168–5 & 6 (Lawrence P. King et al., eds., 15th ed.1997). While the treatise sections governing § 1110 do not address this issue directly, they also support the conclusion that the making of a § 1110(a)(1)(A) agreement neither divests financiers of their right immediately to seek relief from the stay nor debtors of their right to cure. *See* 7 Collier on Bankruptcy, ¶¶ 1110.04[2][b] & ¶ 1110.05[1][d].[7] The question on appeal was simply whether the special interest provisions of § 1110 continued to govern these rights after the expiration of the 60/90 day period or whether they were more appropriately governed by different provision(s) of the Code.

### 2. Application of § 365.

I determined the continuing rights of aircraft lessors and their debtors after the 60/90 day period under § 1110 expires are more appropriately governed by § 365. Again, support for this conclusion may be found in the legislative history of § 1110.

---

**6.** In dicta, the Eleventh Circuit interpreted § 1110 as allowing debtors to avoid repossession if they (1) "agree to perform" their obligations under an unexpired lease and (2) cure "all prior defaults … [and] any defaults that occur *after the agreement to perform is made* … within 30 days after they occur." *Id.* at n. 10 (emphasis added). "If these conditions are met," the court concluded, "the financier may not retake possession of the equipment." *Id.* (citing H.R.Rep. No. 595, 95th Cong. 1st Sess. 239 (1977), U.S.C.C.A.N.1978, p. 6198).

As set forth above, I considered and rejected this open-ended interpretation of § 1110(a)(1)(B)(ii) as one that would invite abuse and delay and deprive lessors of all certainty with respect to the debtor's intentions and the application of § 1110. Such an interpretation would leave lessors, other creditors, airline employees, and the travelling public to wonder, month to month, whether the airline would make its payment or reject the lease.

**7.** "[E]ven though the trustee agrees to perform all of the debtor's obligations under a security agreement, lease or conditional sales contract, and even though the relevant contract may specify a much shorter grace period, the trustee is entitled to a statutory 30-day period to cure relevant postpetition defaults before the automatic stay is suspended." Collier, at ¶ 1110.04[2][b]. On the other hand, and "[n]otwithstanding the trustee's compliance with sections 1110(a)(1)(A) and (B), section 1110 does not prevent a creditor from seeking relief from stay on an immediate basis if the trustee defaults and the default has the effect of jeopardizing the value of the equipment." *Id.* at ¶1110.05[1][d]. A creditor "need not wait until the expiration of the relevant 60 or 30-day period prescribed in sections 1110(a)(1)(A) or (a)(1)(B) to seek appropriate relief under § 363(e) if necessary to protect his or her interest." *Id.*

■ In enacting the Bankruptcy Reform Act of 1978, Congress stated that the protection afforded aircraft lessors under the new § 1110 was "similar to that contained in other sections of the bill governing use of collateral by the estate and the treatment of executory contracts and unexpired leases." H.R. Rep. 95–595 at p. 239, 1978 U.S.C.C.A.N. at p. 6199 (specifically citing proposed Code sections 361–365). This "similarity," however, did not denote mutual exclusivity. To the contrary, Congress's intent was clearly to illuminate, rather than supplant, § 365 in the context of airline bankruptcies.

No fewer than six provisions of the proposed § 365 applied specifically to airline industry leases. *See, e.g.,* § 365(d)(5)-(9), (f)(1)(leases of nonresidential real property). The bankruptcy court in this very case invoked § 365(d)(1), governing trustee's performance obligations under a lease until it is assumed or rejected, to grant WestPac a 72-hour extension of time in which to cure its February failure to make payment under its aircraft equipment leases. According to House Report 95-595, the "major difference" for transportation equipment under the Code was that § 1110 would "define more precisely what constitutes adequate protection," namely, "the payments and duties of the debtor called for under the security agreement" as they became due. H.R. Rep. at 240, 1978 U.S.C.C.A.N. at p. 6199.

"In the case of a lease," moreover, Congress stated, *"the protection is the same* afforded other lessors, but the trustee is required to make a decision within 60 days of the order for relief," rather than having no specific time limit as is the case under § 365. *Id.* (describing how this "quick decision requirement" provides "some additional measure of protection for [the] equipment financier")(emphasis added).

Most importantly for our purposes here, Congress also expressly distinguished between a trustee's agreement under § 1110 to perform and cure a lease and a formal assumption or rejection of a lease under § 365:

[U]nder Section 1110(a) the trustee or debtor in possession is not required to assume the executory contract or unexpired lease under section 1110; rather, if the trustee or debtor in possession complies with the requirements of section 1110(a), the trustee or debtor in possession is entitled to retain the aircraft or vessels subject to the normal requirements of section 365.

H.R. Rep. 95–595 at 1130–31.

■ Thus, "[a]lthough section 1110 requires the trustee to agree to perform the debtor's obligations and cure certain defaults in order to prevent repossession, the trustee's option to 'perform and cure' is not the same thing as a formal 'assumption' under section 365." 7 Collier on Bankruptcy ¶ 1110.05[2][a] & [b]. The distinction means that the trustee who elects to "perform and cure" under § 1110, unlike one who formally assumes the lease under § 365, is obligated under the lease only as long as he retains possession. *See In re Airlift,* 761 F.2d at 1509–10. Nothing in the making of a § 1110 agreement prevents a trustee from later rejecting a lease, *or formally assuming* it under the terms of § 365. Collier, *supra,* at ¶ 1110.05[2][b]. *Id.*[8]

For these reasons, I concluded a better interpretation of § 1110 with respect to the rights and obligations of a debtor airline and the lessors of its aircraft was to give effect to the distinction between a § 1110(a)(1)(A) performance agreement and a formal assumption under § 365 and to interpret its special protections narrowly. Rather than extend the lessors' rights unilaterally and immediately to retake possession of its aircraft and the debtor's concomitant right to cure beyond the statute's specific 60/90 day term, I determined these rights are governed more comprehensively and with greater certainty under § 365. Neither the right nor the remedy would be self-executing. The parties would have to appear before the court and the court would consider the parties' respective interests, together with those of the

---

**8.** Although other considerations, such as the debtor's solvency, the status and viability of reorganization or the adequacy of the protections available to the lessor, may affect this ability.

These considerations are all part of any action on the part of the lessor or trustee under §§ 363(e) or 365.

estate, the reorganization process generally and other creditors, including superpriority postpetition lenders. Lessors would be entitled to the benefit of their bargain under § 365 and, as always, would be entitled under § 363(e) immediately to seek relief from the stay if the value of their collateral was being compromised.

### III. *CONCLUSION.*

Based on the foregoing, IT IS ORDERED that the motions for rehearing and for reconsideration of my March 10, 1998 Memorandum Decision on Appeal filed by appellees GATX, Boullioun and Sunrock are GRANTED and the Decision REAFFIRMED. WestPac's Motion to Strike Exhibits, directed to the affidavits and the newspaper article attached to GATX's brief in support of the Motion for Rehearing, is DENIED.

IT IS FURTHER ORDERED that the Motion for Certification Pursuant to 28 U.S.C. § 1292(b) filed by appellee and cross-appellant Babcock & Brown Aircraft Management is also GRANTED.