**In re UAL CORPORATION, et al., Debtors.**

**No. 02 B 48191.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Sept. 25, 2003.

James H.M. Sprayregen, Marc Kieselstein, David R. Seligman, James J. Mazza, Jr., Kirkland & Ellis, Chicago, IL, for Debtors.

Ronald Barliant, Andrew E. Weissman, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL; Richard Hiersteiner, Jeanne P. Darcey, Palmer & Dodge LLP, Boston, MA, for U.S. Bank National Association.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

These cases have come before the court on four related motions. The first three are motions of U.S. Bank, N.A., ("the Bank") requesting enforcement of the debtors' election to perform under § 1110(a) of the Bankruptcy Code (Title 11, U.S.C.) with respect to three aircraft in their possession. Specifically, the Bank seeks immediate payment, as an administrative expense, of all obligations arising before and during the administration of these cases under the financing agreements governing the three aircraft. The remaining motion, brought by the debtors, is a conditional one: if the court determines that payment of the administrative expense claimed by the Bank would be required under § 1110(a), the debtors request that the court vacate its order approving the debtors' § 1110(a) election with respect to the aircraft in question. As discussed below, the payment sought by the Bank would be required under the debtors' judicially—approved election pursuant to § 1110(a), but vacating the order approving that election is appropriate. Accordingly, the debtors' motion will be granted and the Bank's motions denied.

### Jurisdiction

Federal district courts have exclusive jurisdiction over bankruptcy cases. 28 U.S.C. § 1334(a). Pursuant to 28 U.S.C. § 157(a), district courts may refer bankruptcy cases to the bankruptcy judges for their district, and, by Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such a reference of the pending case. When presiding over a referred case, a bankruptcy judge has jurisdiction, under 28 U.S.C. § 157(b)(1), to enter appropriate orders and judgments in core proceedings within the case. The pending motions are core proceedings under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate), (b)(2)(B) (allowance or disallowance of claims against the estate), and (b)(2)(M) (orders approving the use or lease of property). This court therefore has jurisdiction to enter a final order with respect to the matters now before it.

### Statement of Facts

The facts relevant to the pending motions are undisputed.

UAL Corporation operates a large airline. On December 9, 2002, UAL and twenty-seven of its related corporations filed the pending bankruptcy cases. These filings brought into operation the special aircraft financing provisions of § 1110 of the Bankruptcy Code.

*The general impact of § 1110.* The pending motions raise questions about several aspects of § 1110, but the parties agree about its general impact in these cases. Section 1110 applies to leased or financed aircraft and related equipment used by a debtor air carrier. For such

equipment, § 1110(a) operates to remove any limitations that bankruptcy might otherwise impose on the non-debtor party to the lease or financing agreement. Unless the debtor meets specified conditions, § 1110(a) allows the non-debtor party to exercise all of its contractual rights and remedies with respect to the aircraft, including any right "to take possession of such equipment." Section 1110(a) provides for the application of the automatic stay imposed by § 362 of the Code, preventing the exercise of contractual collection rights, only if the debtor satisfies two conditions—agreement to perform and cure of defaults—set out in § 1110(a)(2).[1]

Section 1110(a)(2)(A) requires a debtor to "agree [ ] to perform all obligations of the debtor" under the lease or financing agreement covering each aircraft it wishes to protect (or, in the shorthand of the parties, make an "1110(a) election" with respect to the aircraft). The 1110(a) election is subject to court approval, and in order to be effective it must be made within the 60–day period following the entry of the order for relief. In voluntary bankruptcy cases like the present ones, the filing of the case constitutes the order for relief pursuant to § 301 of the Code, and so the debtors' time for an 1110(a) election terminated on February 7, 2003, the 60th day after their cases were filed.

Section 1110(a)(2)(B) requires that the debtor cure defaults under the lease or financing agreement covering the aircraft it wishes to protect. It sets out various deadlines for the cure, depending on when the default arose. For defaults arising before the filing of the case—the defaults relevant here— § 1110(a)(2)(i) requires that the debtor effect a cure within the same 60–day period applicable to the 1110(a) election.

The 60–day time limit for the 1110(a) election and the cure of prepetition defaults can be extended, but only with the agreement of the non-debtor party to the applicable lease or financing agreement, again subject to court approval, pursuant to § 1110(b).[2] The parties refer to such an agreement as an "1110(b) stipulation."

*The debtors' response to the § 1110 situation.* At the time of their bankruptcy filing, the debtors had a fleet of approximately 460 aircraft subject to the provisions of § 1110. As to each of these aircraft, the debtors had until February 7, 2003 to take one of three actions: (1) make an 1110(a) election, with whatever legal consequences flowed from "agreeing to perform" under the lease or financing agreement covering the aircraft; (2) decline to make the 1110(a) election, allowing termination of the automatic stay and rendering the aircraft subject to immediate repossession to the extent authorized under the terms of the lease or financing agreement; or (3) negotiate an 1110(b) stipulation extending the 60–day deadline.

**1.** Section 1110(a) actually requires the "trustee" to satisfy these conditions, but pursuant to § 1107(a) of the Code, debtors in possession, like the debtors in the pending cases, have all of the trustee's § 1110 powers and duties.

**2.** As discussed below, § 1110 was amended in 2000. Prior to the amendment, the conditions for application of the automatic stay, including the 60–day limit, were contained in subsection (a)(1). Among other changes, the amendment renumbered the section to remove the conditions and their time limits from subsection (a)(1) and place them into a new subsection (a)(2). However, § 1110(b) was not amended to reflect this change. Both before and after the 2000 amendment, it provided for an agreement to extend "the 60–day period specified in subsection (a)(1)." This is an obvious drafting error; as the parties acknowledge, subsection (b) should be read to allow agreements to extend the 60 day period now contained in subsection (a)(2).

These options led the debtors, in the period prior to February 7, to divide the 460 aircraft subject to § 1110 into four groups, depending on the value of each aircraft compared to the cost of its lease or financing agreement and on the existence of prepetition defaults in the lease or financing agreement.

In the first group, the debtors placed those aircraft whose value equaled or exceeded the amounts due under the relevant lease or financing agreement. As to such "excess-value" aircraft, the debtors' intent was to make the 1110(a) election and cure any prepetition defaults before February 7, allowing the continued use of these valuable aircraft in the debtors' fleet.

The debtors' goal as to the remaining, "deficit-value" aircraft was to keep the aircraft needed for their operations on renegotiated terms, reflecting the current market value of the aircraft, and to surrender the aircraft that they did not need.[3] While negotiations were taking place to determine which aircraft would be retained, the debtors preferred that the automatic stay remain in place if possible. This situation resulted in the division of the deficit-value aircraft into the remaining three groups.

The second group was composed of deficit-value aircraft as to which the debtors were able to execute 1110(b) stipulations, fixing the terms on which they would retain the aircraft and keeping the automatic stay in place.

The third group was composed of deficit-value aircraft as to which the debtors were unable to negotiate 1110(b) stipulations and as to which prepetition defaults existed. For these aircraft, debtors intended to make no 1110(a) election, thus allowing the automatic stay to terminate,

and allowing the aircraft to be repossessed at the option of the non-debtor party to the lease or financing agreement. (Of course, the other party could elect to allow debtors to continue to possess the aircraft pending negotiations, but without the protection of the stay, the debtors would have no right to such continued possession.)

The fourth and final group was composed of deficit-value aircraft as to which the debtors were unable to negotiate an 1110(b) stipulation, but as to which there were no prepetition defaults. As to these aircraft, the debtors' intent was to make the 1110(a) election and then seek to negotiate new terms until the time that a postpetition payment became due under the lease or financing agreement. Then, the debtors would either make the required payment (and so keep the automatic stay in place) or decline to make the payment and suffer the loss of the automatic stay.

To summarize: as to group one (excess-value aircraft), the debtors intended to make the 1110(a) election, in order to retain valuable existing leases or financing agreements; as to group four (deficit-value aircraft without 1110(b) stipulations and with no prepetition defaults), the debtors also intended to make the 1110(a) election, in order to keep the automatic stay in place while they renegotiated the existing leases or financing agreements; as to group two (deficit-value aircraft subject to an 1110(b) stipulation), the 1110(a) election was at least temporarily moot, since alternate terms had been agreed upon; and as to group three (deficit-value aircraft without 1110(b) stipulations and with prepetition defaults), the debtors intended not to make the 1110(a) election and to engage in any renegotiation of the existing leases or

---

**3.** In some of their briefs, the debtors refer to such deficit-value aircraft as "underwater." Given the unpleasant implications of this term in connection with air transportation, it is not used here.

financing agreements without the protection of the automatic stay.

The process of sorting the 460 aircraft into these four groups was a difficult one, requiring the debtors to determine the value of each of the aircraft to their operations, to assemble the complex documentation establishing the lease or financing terms under which the aircraft was held, to determine the payments due under the relevant documents and the nature and amount of any defaults, and to commence negotiations with the appropriate parties for 1110(b) stipulations as to aircraft determined to be of deficit value. To perform these tasks, the debtors created an "1110 team" of at least twenty people, drawn from their own employees and in-house consultants, an outside firm expert in aircraft valuation, and two law firms (general bankruptcy counsel and the firm that had handled the aircraft leases and financing agreements).

On February 6, 2003, one day before the expiration of the 60–day period provided by § 1110(a)(2), the debtors presented a motion for court approval of their 1110(a) elections and 1110(b) stipulations. At that time, the debtors had identified 154 aircraft for which they proposed to make the 1110(a) election and sought authority to make the election as to additional aircraft prior to the termination of the 60–day period (at the end of the following day). The debtors also sought approval for 1110(b) stipulations already negotiated and for a procedure to authorize future 1110(b) stipulations. The debtors requested that information regarding the details of such stipulations not be made a part of the public record but be restricted to its postpetition financiers and the creditors' committee. At the hearing on this motion, nearly all of the argument and discussion concerned the appropriateness of the proposed limitation of disclosure in connection with the 1110(b) stipulations. There was no objection to the debtors' proposed 1110(a) elections.

Following the hearing, on February 7, the court entered an order granting the debtors' motion. The order authorized the debtors "to make 1110(a) elections through and including February 7, 2003" and provided, with some modifications, for the debtors' requested limited notice of the 1110(b) stipulations.

*The pending motions.* Three of the aircraft as to which the debtors made an 1110(a) election pursuant to this order are involved in the pending motions-aircraft with registration numbers N321UA, N322UA, and N643UA. The first two were subject to leveraged lease transactions entered into in 1988 by one of the debtors, United Air Lines, Inc. ("United"); the third was subject to a financing agreement entered into by United in 1991. The debtors had concluded that the amounts owed under the leases and financing agreement exceeded the market value of these aircraft, and so the debtors would only have kept the aircraft in their fleet if the leases and financing agreement could be renegotiated. With the understanding that there were no prepetition defaults in connection with these aircraft, the debtors made the 1110(a) election to retain the protection of the automatic stay while renegotiation took place-thus placing the aircraft into the "group four" category.

However, the debtors' understanding was wrong. The applicable leases and financing agreements all required that United make payments on November 27, 2002, twelve days before its bankruptcy filing. United did not make these payments and remained in default at the time of the filing. The total amount in default was

more than $5.9 million.[4]

The Bank acts as Indenture Trustee in connection with each of the three aircraft. On May 2, 2003, the Bank filed the pending motion regarding the N643UA aircraft, requesting immediate payment, as an administrative expense, of the prepetition default with respect to that aircraft, on the basis that paying the amount in default was one of the obligations under the financing agreement that debtors had agreed to perform in their 1110(a) election. On June 18, the Bank filed similar motions with respect to the N321UA and N322UA aircraft, asserting a right to payment of postpetition as well as prepetition defaults, and amended its request for relief concerning the N643UA aircraft to include postpetition defaults. All three motions sought interest on the amounts in default.

Meanwhile, on May 23, the debtors entered into an "Adequate Protection Stipulation" with the Bank respecting the aircraft in question. Under this stipulation, the Bank agreed not to exercise its right to immediate repossession of the aircraft in exchange for the debtors making periodic "adequate protection" payments, intended to reflect the actual market value of the aircraft. However, the agreements left the Bank free to press its motions for full payment of the amounts in default under the leases and financing agreement covering the aircraft. Pursuant to these adequate protection payments the debtors paid $587,000 to the Bank.

As the following table shows, the combination of prepetition and postpetition defaults, even with the "adequate protection" payments deducted and with interest excluded, totals over $13.4 million.

| Aircraft | Prepetition default | Postpetition default | Adequate Protection Payment | Total |
|---|---|---|---|---|
| N643UA | $5,003,270.80 | $2,923,206.49 | $587,000.00 | $ 7,339,477.29 |
| N321UA | 439,995.22 | 2,588,096.50 | 65,000.00 | 2,963,091.72 |
| N322UA | 468,940.19 | 2,728,450.40 | 65,000.00 | 3,132,390.59 |
| Total | $5,912,206.21 | $8,239,753.39 | $717,000.00 | $13,434,959.60 |

The debtors opposed the Bank's motions for payment of this sum as an administrative expense, contending that § 1110(a) does not create any right to such a payment. However, the debtors also filed a conditional motion to vacate the court order approving their 1110(a) election with respect to the three aircraft in question, asking that this relief be granted if the court did not accept their interpretation of § 1110(a). All of the pending motions—the three filed by the Bank for payment of administrative expenses and the condition-al motion filed by the debtors—have been fully briefed and argued.

Conclusions of Law

As presented by the parties' arguments, the pending motions present three distinct questions for the court to resolve. First, does an 1110(a) election impose an obligation on the debtor to pay ongoing obligations and prepetition defaults as administrative expenses, or is the non-debtor party's remedy for any default in these obligations limited to repossession of the aircraft? Second, even if there is general-

4. These are the amounts claimed in the Bank's motions. The debtors calculate the default at a somewhat higher level.

ly administrative-expense liability in connection with an 1110(a) election, was the debtors' 1110(a) election ineffective with respect to the aircraft involved in the pending motions because the debtors failed to cure the prepetition defaults with respect to these aircraft in a timely fashion? And finally, if the election did impose an administrative-expense obligation on the debtors and the election was otherwise effective, is it appropriate to vacate in part the order approving the 1110(a) election, so as to nullify the debtors' election with respect to the aircraft in question? As discussed below, the debtors' 1110(a) election did carry with it the obligation to make both current payments and payments of prepetition defaults, regardless of their failure to cure prepetition defaults. Nevertheless, the impact of the election can be—and in this case should be—removed by vacating the court's approval of the election as to the aircraft in question.

*1. The history of § 1110.* Special regulation of aircraft financing in bankruptcy has a four-part history, described in some detail in 7 Collier on Bankruptcy ¶ 1110.-L.H. (15th rev. ed.2003). This history provides a helpful background for consideration of the issues raised by the pending motions.

• The first special provision for aircraft financing in bankruptcy was a 1957 amendment to the Bankruptcy Act of 1898. That provision, added to the former Bankruptcy Act as § 116(5), was intended to increase the availability of aircraft financing by allowing aircraft financiers "to make chapter X proceedings inapplicable insofar as they affect title and the right to possess aircraft and aircraft equipment" so that "in the event of default, the right of these creditors to take possession would be preserved." H. Rep. No. 944, 85th Cong., 1st Sess. 2 (1957); 7 Collier on Bankruptcy ¶ 1110.L.H. at 1110–44. As Congress later

recognized, the effect of this provision was to give aircraft financiers "the absolute veto power over a reorganization," since the financiers' agreement would be required for the debtor to retain equipment whose financing was in default. See S.Rep. No. 989, 95th Cong., 2d Sess. 116–17 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5902, 5903; 7 Collier on Bankruptcy ¶ 1110.L.H. at 1110–47 n.14.

• The second stage in the regulatory development was the enactment of the 1978 Bankruptcy Code. Section 1110 of the Code limited the "veto power" that § 116(5) of the Act had created. Rather than leave the financier's rights unaffected by a bankruptcy, § 1110 introduced the concept of allowing "the trustee in a reorganization case an opportunity to continue in possession of the equipment in question by curing defaults and by making the required lease or purchase payments." H. Rep. No. 595, 95th Cong., 1st Sess. 240 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 116–17 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6199, 6200, 5787, 5902, 5903; 7 Collier on Bankruptcy ¶ 1110.L.H. at 1110–47. The mechanism put in place is the one described above:

> [Section 1110] overrides the automatic stay or any power of the court to enjoin taking of possession of certain leased, conditionally sold, or liened equipment, unless the trustee agrees to perform the debtor's obligations and cures all prior defaults ... within 60 days after the order for relief. The trustee and the equipment financier are permitted to extend the 60–day period by agreement. During the first 60 days, the automatic stay will apply to prevent foreclosure unless the creditor gets relief from the stay.

*Id.*

• The third stage in the regulation of aircraft financing came with the Bankrupt-

cy Reform Act of 1994, which expanded the scope of the equipment covered by § 1110. As originally enacted, the section covered only purchase money financing. The 1994 legislation amended the section to "protect all lease financing agreements and all debt financings that involve a security interest, not only security interests obtained at the time the equipment is acquired." H. Rep. No. 103–384, 103d Cong., 2d Sess. 19 (1994).

● Finally, in 2000, § 1110 took its present form, with amendments designed primarily to overrule a judicial decision dealing with postpetition defaults in aircraft financing agreements. As originally enacted, § 1110 provided that a debtor wishing to retain the protection of the automatic stay as to equipment within the scope of the section's coverage had to cure all prepetition defaults in the first 60 days of the bankruptcy case, and to cure postpetition defaults "before the latter of (I) the date that is 30 days after the date of the default; or (II) the expiration of such 60–day period." In *In re Western Pacific Airlines, Inc. v. GATX Capital (In re Western Pacific Airlines, Inc.)*, 219 B.R. 305, *reaff'd on rehearing*, 221 B.R. 1 (D.Colo. 1998), the district court interpreted this language as applying only to defaults by the debtor that occurred before the end of the 60 period (and so subject to cure within a maximum of 90 days after the bankruptcy filing). The court held that defaults incurred after the 60–day period would be treated under other provisions of the Code. *Id.* at 310.[5] Congress responded to "the ambiguity created by . . . decisions

in the Western Pacific bankruptcy case" (H.R. Conf. Rep. No. 106–513 at 218 (2000)), by clearly providing both that § 1110 did apply to defaults after the initial 60 days of the bankruptcy and that there was no extended cure period for such defaults. To retain the protection of the automatic stay, the debtor who defaulted after the initial 60 day period would be required to cure the defaults "in compliance with the terms" of the applicable lease or financing agreement, "if a cure is permitted." P.L. 106–181, § 744(b), codified as 11 U.S.C. § 1110(a)(2)(B)(iii).

■ *2. An 1110(a) election requires payment of both prepetition defaults and current obligations as administrative expenses.* The most general reason that the debtors give for denying the Bank's motions for payment of administrative expenses is that an 1110(a) election does not impose administrative expense liability. This argument, however, is refuted by the language and history of § 1110.

As noted above, § 1110(a) requires that to retain the protection of the automatic stay with respect to particular aircraft in its fleet, a debtor air carrier must make the 1110(a) election with respect to the lease or financing agreement applicable to the aircraft—that is, in the language of the statute, the debtor must "agree[ ] to perform all obligations of the debtor." Congress's use of the term "agree" is of substantial significance in resolving the question of whether a debtor's failure to perform its obligations under an 1110(a)

---

**5.** The court phrased its holding as follows: [Section 1110] services a limited function, providing lessors of aircraft equipment . . . with relief from the stay *unless* the trustee or debtor-in-possession reaffirms its defaults within a statutorily prescribed period. Once the debtor does so, the section has served its purpose.

If the debtor emerges from the 60/90 day period with current payments and a renewed agreement to comply with its lease terms, then the lessor's potential automatic right to a lifting of the automatic stay terminates and it assumes the status of any other lessor/creditor in bankruptcy.

election gives rise to an administrative claim.

■ When a debtor enters into an agreement during the course of a bankruptcy case, the other party to the agreement may ordinarily obtain payment of the debtor's obligations as an administrative expense, with a first priority under §§ 503(b) and 507(a) of the Bankruptcy Code. *See In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984) ("If a reorganization is to succeed, creditors asked to extend credit after the petition is filed must be given priority so they will be moved to furnish the necessary credit to enable the bankrupt to function.").[6] Had Congress wished to limit the remedy of the aircraft financier to repossession of its collateral, it could simply have provided that the automatic stay would terminate unless the debtor performed all of its obligations under the applicable lease or financing agreement. By requiring a postpetition "agreement" of the debtor to perform these obligations, the statutory language gives rise to administrative expense liability. This conclusion has been reached by the only circuit court decisions dealing with the issue. *GATX Leasing Corp. v. Airlift International, Inc. (In re Airlift International Inc.)*, 761 F.2d 1503, 1510 (11th Cir.1985) (breach of the obligations under a 1110(a) election treated as "a postpetition breach giving rise to a section 503(b) claim for administrative expenses"); *In re Trans World Airlines, Inc.*, 145 F.3d 124, 142 (3d Cir.1998) ("If the lease obligations [under an 1110(a) election] are not met, such failure constitutes a breach of the § 1110 agreement giving rise to an administrative claim.").

■ The history of § 1110 confirms this reading. Congress is "presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). With § 1110, the rationale for this presumption is even stronger than in the situation of a simple reenactment. The 2000 amendment of § 1110 was intended primarily to correct what Congress saw as mistaken opinions of a single district court in *Western Pacific Airlines*, and Congress made changes in the statutory language bearing on the cure period for postpetition defaults. Had Congress had been dissatisfied with the interpretation of two circuit courts with respect to the debtor's administrative expense liability for breaches of the obligations included in the 1110(a) election, Congress would similarly have changed the statutory language bearing on the election. Its failure to change this language can only be seen as approval of the *Airlift* and *Trans World* readings imposing administrative expense liability.

The 2000 amendments also make clear that the obligations that a debtor undertakes by in making an 1110(a) election—obligations giving rise to administrative expense liability—include payment of prepetition defaults as well as obligations arising postpetition. Before the 2000 amendment, the § 1110(a) election required an agreement to perform all obligations of the debtor "that become due on or after the date of the order [for relief]." The 2000 amendment removed the quoted language, so that the election now requires an agreement simply to "perform all obligations of

---

**6.** *Jartran* goes on to note that administrative expense priority is usually accorded only to postpetition agreements that are "beneficial to the debtor-in-possession in the operation of the business." *Id.* at 587 (quoting *In re Mam-* *moth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)). However, by making the election subject to court approval, Congress apparently intended that 1110(a) elections would benefit the administration of the estate.

the debtor." The only purpose that can reasonably be attributed to this change is to include performance of obligations that became due prior to the date of the order for relief—that is, payment of prepetition defaults.

 *3. Failure to cure prepetition defaults does not void an 1110(a) election.* Debtors' other argument concerning the interpretation of § 1110 more narrowly addresses the three aircraft involved in the pending motions. Debtors contend that their failure to cure the prepetition defaults on these aircraft within the 60–day period after filing, as required by § 1110(a)(2)(B)(i), prevented their 1110(a) election from becoming effective. Here is how this argument proceeds in the debtors' July 2 brief opposing the Bank's motions:

> [S]ection 1110(a) ... unambiguously requires a debtor to take two steps in order to make an election.... First, a debtor must agree to perform all obligations under the relevant security agreement, lease, or conditional sale contract. 11 U.S.C. § 1110(a)(2)(A). Second, a debtor must cure certain defaults that may exist under the relevant security agreement, lease, or conditional sale contract. 11 U.S.C. § 1110(a)(2)(B)(iii). The Bankruptcy Code requires *both* of these conditions for a valid section 1110(a) election. *See* 11 U.S.C. 1110(a)(2)(A); *see also* ... 7 *Collier on Bankruptcy* ¶ 1110.04[2] at 1110–28 (L. King 15th ed.1985) ("Pursuant to section 1110(a)(2)(B), even if the trustee agrees to perform all of the debtor's contractual obligations on an ongoing basis, the trustee's failure to timely cure certain defaults is sufficient to permit the secured party, lessor or conditional sales vendor to take repossession [*sic*: 'possession' in the original text] of the covered equipment").

Brief, Docket No. 1207, at 5.

The debtors' argument simply misreads the statute, as the quotation from *Collier* makes clear. To retain the protection of the automatic stay, § 1110(a) imposes two requirements: the 1110(a) election (an "agreement to perform") under paragraph (2)(A), and cure of defaults under paragraph (2)(B). A failure to cure defaults under paragraph (2)(B) consequently results in termination of the automatic stay. However, nothing in this result requires voiding the distinct "agreement to perform" involved in the election under paragraph (2)(A).

It is true, as debtors point out, that their bankruptcy estates received no benefit from the 1110(a) election. Indeed, as discussed below, making the election without timely curing prepetition defaults is necessarily a mistake. That the election was mistaken, however, and that it conferred no benefit, does not mean that it is automatically void. Parties can obtain relief from agreements into which they have entered under various legal doctrines, including fraudulent inducement,[7] duress,[8] and the doctrine of mistake itself.[9] But the premise from which all of these doctrines proceed is that, in the absence of special circumstances, even agreements entered into in error are effective and the parties are required to bear the consequences.[10] Thus, again, the use of the

---

**7.** *See* Restatement (Second) of Contracts § 164 (1981).

**8.** *See* Restatement (Second) of Contracts § 175 (1981).

**9.** *See* Restatement (Second) of Contracts §§ 153, 157 (1981).

**10.** *See* Restatement (Second) of Contracts § 154 (1981) (citing *Cohen v. North Ridge Farms, Inc.*, 712 F.Supp. 1265, 1271 (E.D.Ky.

term "agree" in § 1110(a)(2)(A) implies that a bankruptcy estate may be bound by the election of the trustee or debtor in possession to perform obligations under applicable aircraft financing terms, regardless of whether that election produces the desired retention of the automatic stay as to the aircraft. Indeed, an obligation to honor the "agreement to perform" by payment of an administrative expense may be seen as a powerful incentive to debtors to exercise the 1110(a) election carefully and to cure prepetition defaults in a timely fashion when the election is exercised. The debtors' interpretation of § 1110(a), to the contrary, would create a reverse incentive: for debtors to exercise the 1110(a) election willy-nilly as to all aircraft with prepetition defaults, and then render it ineffective by not curing defaults in a timely fashion for any aircraft as to which they later conclude that the election was undesirable.

■ *4. It is appropriate to vacate the order approving debtors' 1110(a) election as to the aircraft involved in the Bank's motions.* Given the conclusions reached above, the Bank would be entitled to payment as an administrative expense of the entire $13.4 million sought by its pending motions, unless the court grants the debtors' conditional motion to vacate its order approving their 1110(a) election as to the aircraft in question.[11] That motion is grounded primarily in Fed.R.Civ.P. 60(b)(1), made applicable in bankruptcy cases by Fed. R. Bankr.P. 9024.

Rule 60(b)(1) provides that "upon such terms as are just, the court may relieve a party or a party's legal representative from a final . . . order . . . for . . . mistake,

inadvertence, surprise, or excusable neglect." The Seventh Circuit, for some time, had taken a narrow view of the kind of conduct for which relief could be granted under this standard. *See, e.g., Bershad v. McDonough*, 469 F.2d 1333, 1337 (7th Cir.1972) ("Neither ignorance nor carelessness on the part of a litigant or his attorney provide grounds for relief under Rule 60(b)(1)."). However, in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the Supreme Court interpreted "excusable neglect," as that term is used in Fed. R. Bankr.P. 9006(b), to a extend to a lawyer's failure to meet a filing deadline, and the *Pioneer* decision caused the Seventh Circuit to modify its approach to Rule 60(b)(1). *See Robb v. Norfolk & W. Ry. Co.*, 122 F.3d 354, 361 & n. 5 (7th Cir.1997) (adopting *Pioneer's* approach to "excusable neglect" for application of Rule 60(b)(1)).

*Pioneer* interpreted "excusable neglect," in the context of the filing deadlines, to include at least some situations of negligence by the party seeking relief. *Pioneer*, 507 U.S. at 394–95, 113 S.Ct. 1489. To distinguish excusable from inexcusable conduct, the Supreme Court offered the following guidance:

> Because Congress has provided no other guideposts of determining what sorts of neglect will be considered "excusable," we conclude that the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include . . . the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the

1989) (purchaser unable to rescind contract for defective race horse)).

**11.** The parties disagree about whether such an administrative expense award should be

payable immediately. Because the debtors' motion to vacate is being granted, that disagreement need not be resolved here.

reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* at 395, 113 S.Ct. 1489 (footnote omitted).

The circumstances relevant to the debtors' obtaining court approval of the 1110(a) elections involved in the pending motions all indicate that this approval should be vacated as resulting from excusable neglect. First, the 1110(a) election with respect to the three aircraft involved in these motions is manifestly prejudicial to the debtors. After all, these were aircraft as to which the debtors had determined that the existing financing arrangements were detrimental to their operations—that it would be better to surrender the aircraft than to pay for them under the existing financing terms. The only reason to make the election was that no payments were currently due, and so making the election would retain the effectiveness of the automatic stay while revised financing terms were negotiated. Even this benefit was negligible, since if no prepetition defaults existed and no postpetition payments had yet become due, it is unlikely that there would have been a contractual right to repossession requiring the maintenance of the automatic stay. Certainly, the continued application of the stay was not worth the immediate payment of $5.9 million in prepetition defaults. And, since the debtors had no intention of paying prepetition defaults (mistakenly believing that none existed), the 1110(a) election provided no benefit whatever to their estates. Without the cure of the prepetition defaults, the only benefit of the 1110(a) election-continuation of the automatic stay—vanished with the end of the 60th day of bankruptcy, just as it would have without the 1110(a) election. Under these circumstances, the 1110(a) election amounted to a unilateral declaration that the debtors would commit to paying $5.9 million for nothing. And during the time the question of the debtors' obligations under § 1110 has been under consideration in this court, other contractually due payments have swollen the cost of the 1110(a) election—still with no accompanying benefit—to $13.4 million.

Moreover, the prejudice here is not just to the party that erred, but also to the estates of debtors in bankruptcy. The parties who will ultimately suffer from a benefit-less transfer of the debtors' assets are the other creditors with claims against the estates. In an extreme situation, the funds involved here could make a difference in the debtors' ability to reorganize successfully.

In contrast, vacating the debtors' 1110(a) election would cause no comparable prejudice to the Bank. Since the prepetition defaults were not cured by the end of 60th day, the Bank had precisely the "veto" right envisioned by § 1110—the right to repossess its collateral, free from any bankruptcy constraints. The debtors' election had no effect whatever on this right. As it happens, the Bank negotiated with the debtors to allow them, on agreed payment terms, to continue using the aircraft in question. However, the 1110(a) election was irrelevant to the negotiation of these terms, since the Bank was free to repossess the collateral if the debtors failed to offer terms that the Bank found acceptable. As to the Bank, the 1110(a) election was simply a windfall. The election allows the Bank, without surrendering any right it would otherwise possess, to claim a priority entitlement from the debtors' estate of several million dollars.

Finally, there is nothing to indicate that the debtors engaged in any culpable behavior or acted in bad faith. They diligently assembled a substantial team of professionals to analyze the complex set of

factors bearing on their need to maintain an optimum fleet of aircraft at the lowest possible cost, consistent with the deadlines and requirements of § 1110, while pursuing the numerous other responsibilities present at the outset of a large Chapter 11 reorganization. Plainly, someone's neglect resulted in an uninformed exercise of the 1110(a) election. But the neglect appears, from all indications, to have been an honest error.

The Bank does not dispute this weighing of the relevant factors. Rather, its initial contention is that Rule 60(b)(1) does not apply because this court's order of February 7 merely gave the debtors authority to enter into 1110(a) stipulations, rather approving particular 1110(a) elections. However, § 1110(a)(2)(A) makes all agreements by debtors to perform financing obligations "subject to court approval." Hence, the court's order must be seen as approving the debtors' election as to the aircraft involved here.

Moreover, it is certainly possible for an order to be vacated only in part—that is, it is possible to withdraw court approval from some of a trustee's actions covered by an order while leaving others effective. This, indeed, was the result of a Seventh Circuit decision that—even under the court's pre-*Pioneer* standards—allowed a trustee relief from a mistake that prejudiced the estate. *In re Lintz West Side Lumber, Inc.*, 655 F.2d 786 (7th Cir.1981), arose from a bankruptcy trustee's motion to abandon certain property of the debtor, including inventory and accounts receivables "purportedly subject" to the security interest of a bank. *Id.* at 788. The bankruptcy court authorized the abandonment, but then, sometime later, the trustee "petitioned the court to set aside the order of abandonment on the grounds that the trustee had discovered an apparent defect in the bank's financing statement." *Id.* The

bankruptcy court granted the motion, vacating its order of abandonment, and the Seventh Circuit affirmed, basing its decision primarily on the inherent power of a bankruptcy judge "to reexamine and revise an order which he entered during the pendency of the bankruptcy proceedings." *Id.* at 789. The court then added:

> [T]he provisions of Rule 60 of the Federal Rules of Civil Procedure are applicable to bankruptcy practice and would have provided a basis for setting aside the ... abandonment order even if the bankruptcy judge had been otherwise specifically prohibited from reconsidering such orders. *See* R.Bankr.P. 924. The absence of an explicit ban on reconsideration of abandonment orders in the bankruptcy rules and the availability of alternative relief [under Rule 60] tend to indicate that abandonment orders remain subject to the "ancient and elementary power [of the bankruptcy judge] to reconsider his own orders." *[In re] Pottasch Bros. [Inc.]*, 79 F.2d [613] at 616 [ (2d Cir.1935) ]. If a mistake has been made, it should be corrected, if the correction is not unfairly prejudicial to innocent parties.

*Id.* The fact that the order approved abandonment of property other than that covered by the possible defective lien was no obstacle to the vacation.

The *Lintz* decision also undercuts the Bank's arguments that Rule 60(b)(1) only applies to procedural errors (such as untimely filing or failures to appear) and not to failures to uncover relevant information. To the contrary, the court noted that Rule 60(b) was applicable precisely because the trustee and bankruptcy judge were not aware at the time the abandonment was approved of facts relating to the bank's financing statement. *Lintz*, 655 at 791 n. 6.

Thus, Rule 60(b)(1) applies to this court's order approving the debtors' 1110(a) election as to the aircraft in question, and the factors bearing on the Rule's application indicate that this approval should be vacated. The only remaining question is what "just" terms are required in connection with the vacation. These terms should have the effect, to the extent possible, of placing the Bank in the position it would have occupied had the debtor not made the election with respect to the subject aircraft; thus, the Bank should be allowed recovery of the attorneys' fees and costs that it reasonably incurred in pursuing the litigation involved in this motion. If the Bank has incurred any other costs as a result of the debtors' erroneous election, the court will consider a further award on motion from the Bank.

### Conclusion

For the reasons set out above, the debtors' motion to vacate this court's approval of its 1110(a) election with respect to the subject aircraft is granted, subject to the debtors' payment of the attorneys' fees and costs incurred by the Bank in connection with the motions decided herein. The Bank's motions for payment of administrative expenses are denied. A separate order will be entered to this effect.